IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>CHAD WILLIAM PETERSON,<br><br>Defendant. | MEMORANDUM DECISION AND ORDER DENYING MOTION TO SUPPRESS<br><br><br><br>Case No. 1:06-CR-94 TS |

This matter is before the Court on Defendant's Motion to Suppress.

I.  FINDINGS OF FACT

During the evening of July 12, 2006, the Weber/Morgan Narcotics Strike Force (Strike Force) was conducting a "controlled buy" of drugs by an undercover officer from a female target (the Target) at an Ogden motel.  An Ogden City Police officer assigned to the Strike Force (the Strike Force Officer) was responsible for securing the perimeter of the motel and surveilling its parking lot.  He testified at the hearing that a controlled buy is a dangerous and uncertain situation.  As a safety precaution, the Strike Force tightly controls the immediate area surrounding a controlled buy.

The Strike Force Officer watched the Target arrive at the motel in a pickup truck, pick up the confidential informant (CI), leave with the CI, return to the motel and park the pickup, and go into the motel where an undercover officer was waiting.  The Strike Force Officer then heard over his radio or cell phone that the controlled buy was completed in the motel room and that the Target was arrested.

Immediately after the arrest, as he moved in from the perimeter to the Target's pickup, the Strike Force Officer observed a red vehicle arrive and park next to the Target's vehicle.  He then observed an unidentified male (Defendant) approach the Target's pickup truck, lean in its open passenger side window and place his hands inside the pickup where his hands remained outside of the Strike Force Officer's view.  Knowing that the pickup had just been used in a confirmed controlled buy, the Strike Force Officer suspected that Defendant was there to get more drugs, drop off money, provide protection to the Target, or was otherwise involved in the drug transaction completed only minutes before. Concerned for officer safety because he couldn't see Defendant's hands, the Strike Force Officer called for assistance, approached the pickup, and identified himself as a law enforcement officer.  When approached, Defendant's eyes widened and he backed away from the pickup.  The  Strike Force Officer said "don't," and directed him to stop and get on the ground.  At the same time, other officers converged on the scene in response to the arrest signal that had been given a few minutes earlier.  When he was on the ground, the Strike Force Officer asked Defendant if he had any weapons, his name, and what he was doing in the Target's truck.  Defendant said he had been playing with the Target's dog. There was a small dog in the pickup on the passenger side.  The Strike Force Officer,

following his routine, also asked Defendant if he was on probation or parole. Defendant replied that he was and said his Adult Probation and Parole (AP&P) agent's name was Warr.

An Odgen City officer (Ogden Officer) who was not a member of the Strike Force, but who was helping with the controlled buy, arrived to assist the Strike Force Officer with Defendant. The Ogden Officer patted down Defendant, and following the Strike Force Officer's instructions, placed Defendant in handcuffs. The Ogden Officer seated Defendant on the sidewalk while the Strike Force Officer called Agent Warr from the parking lot. The Strike Force Officer told Agent Warr that he was conducting a drug operation and that Defendant had arrived on the scene and was part of the investigation. Agent Warr confirmed Defendant's status as a parolee, stated he was looking for Defendant, and requested that the Strike Force Officer detain Defendant until Agent Warr could arrive. The Strike Force Officer left to assist in the motel while the Odgen Officer waited with Defendant, handcuffed and seated on the sidewalk, for Agent Warr.

Agent Warr arrived in about five to ten minutes. Coincidentally, Agent Warr and his supervisor had been conducting field visits that day and had just left Defendant's residence. When he got the call from the Strike Force Agent, Agent Warr understood that Defendant had been in the area of the controlled drug buy, and suspected that Defendant was in violation of his parole.

When he arrived, Agent Warr moved Defendant to a vehicle to question him about his involvement in the drug operation. Defendant said he had been there at the scene and that there were some other females there who were involved in the deal. Defendant

indicated that he had arrived in a red car parked next to the Target's pickup. Based on this information, Agent Warr believed that Defendant was in violation of his parole's requirement that he not associate with persons involved in criminal activity. Agent Warr directed the Ogden City Officer to search the red car.

The Ogden City Officer found a blue towel wrapped around a handgun underneath the red car's front seat. Agent Warr returned to the vehicle and advised Defendant of his *Miranda* rights and questioned him about the handgun.

Defendant's parole agreement provides that as a parolee he "will not knowingly associate with any person who is involved in criminal activity or [who] has been convicted of a felony without approval from [his] AP&P officer."[1] The agreement also provides that he will permit AP&P officers to search his person, residence, or vehicle based upon reasonable suspicion to ensure compliance with his parole conditions.[2]

## II.  DISCUSSION AND CONCLUSIONS OF LAW

Defendant moves to suppress the evidence of the handgun and any incriminating statements Defendant may have made and argues that the officers did not have a reasonable suspicion to stop and detain him for questioning and that he should have been released prior to his vehicle being searched. The government contends that the officer had

---

[1] Tran. at 46.

[2] *Id.*

reasonable articulable suspicion necessary to justify Defendant's detention under *Terry*,[3] and that the stop was limited in scope and duration.

> *Terry* sets up a two-prong test of the reasonableness of investigatory detentions and weapons searches. First, we must decide whether the detention was " 'justified at its inception.'" The government "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." Those facts must tend to show that the detainee has committed or is about to commit a crime. Second, the officer's actions must be "'reasonably related in scope to the circumstances which justified the interference in the first place.'" At both stages, the reasonableness of the officer's suspicions is "judged by an objective standard taking the totality of the circumstances and information available to the officers into account."[4]

Examining the initial stop, the Court finds the timing and location of the encounter significant. The timing was during and immediately following a controlled buy. Several things made the location significant. First, it was within the Strike Force's designated perimeter of the operations scene for the controlled buy. Second, and more significantly, Defendant located himself partially inside the pickup that the just-arrested Target had driven in order to obtain the drugs. Third, by leaving his hands inside the pickup, Defendant was placed so that the officers converging on the scene could not see his hands, raising a serious officer safety issue. Thus, it was not merely Defendant's presence in the area of the controlled buy, or merely that he was nearby the pickup, that gave rise to the reasonable articulable suspicion; it was his odd interaction with the Target's pickup.

---

[3] *Terry v. Ohio*, 392 U.S. 1 (1968).

[4] *United States v. Johnson,* 364 F.3d 1185, 1189 (10th Cir. 2004) (quoting *Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1028 (10th Cir. 1997) (quoting *Terry*, 392 U.S. at 20)); *United States v. Shareef*, 100 F.3d 1491, 1500 (10th Cir. 1996); and *United States v. Lang*, 81 F.3d 955, 965 (10th Cir. 1996) (other quotations omitted).

Even absent the knowledge of the immediately preceding controlled buy, it would be suspicious for an individual to place and leave his hands in a vehicle that someone else had left in a parking lot. With the knowledge that the pickup had been involved in the controlled buy, it becomes highly suspicious activity.

The totality of the facts known to the officer—including that the Target had used the pickup to go and get the drugs, there had been an arrest on the controlled buy, Defendant suddenly appeared at the scene and was doing something in the pickup, and the reasonable inferences from these facts—gave rise to a reasonable articulable suspicion that Defendant had committed or was about to commit, a crime. The Court finds that the initial stop was justified by reasonable suspicion at its inception.

> [A] detention "does not become unreasonable just because police officers use handcuffs on a subject or place him on the ground." The use of handcuffs during the course of an investigative detention is a reasonable means of neutralizing potential danger. Ordering a suspect to lie down on the ground and handcuffing him, "provides the officers with a better view of the subject and prevent[s] him from obtaining weapons which might ... [be] in the car or on his person."[5]
>
> The allowable scope of an investigative detention cannot be determined by reference to a bright-line rule; "common sense and ordinary human experience must govern over rigid criteria." Moreover, we should not engage in "unrealistic second-guessing" of a police officer's decision.[6]

---

[5] *United States v. Valenzuela,* 2007 WL 1068110, *3 (10th Cir. April 11, 2007) (quoting *United States v. Neff*, 300 F.3d 1217, 1220 (10th Cir. 2002) (other citations omitted)).

[6] *Neff,* 300 F.3d at 1220 (quoting *United States v. Sharpe*, 470 U.S. 675, 685 (1985)).

The actions of the Strike Force Officer and the Ogden City Officer in directing Defendant to lie on the ground, conducting a pat down, and initially securing him with handcuffs were reasonably related in scope to the circumstances which justified Defendant's initial stop and detention and also by officer safety concerns.  Defendant was reasonably suspected of involvement in a drug deal, he was located with his hands inside a pickup in the time frame when it had been used in the drug deal, and his hands were where the officer could not see them during the dangerous and uncertain situation of a controlled buy.

Defendant next argues that he should have been released right away because any reasonable suspicion was dissipated when he provided an explanation for his action—playing with the dog—and Agent Warr confirmed his identity. However, the Fourth Amendment does not require the police to be "so credulous"[7] as to unquestioningly and immediately accept without further evaluation any seemingly plausible explanation in the face of reasonable articulable suspicion of criminal activity.   In this case, the Strike Force Officer was justified in his action of briefly continuing the detention while he confirmed Defendant's information.  When the Strike Force Officer called to confirm Defendant's parolee status, the answering AP&P Agent directed the Strike Force Officer to continue the detention because he would be "right down"[8] to deal with Defendant regarding a suspected parol violation.

---

[7] *Johnson*, 364 F.3d at 1192.

[8] Trans. at 43.

7

Under the totality of the circumstances, it was reasonable for the officers at the scene to comply with Agent Warr's direction that Defendant's detention be briefly extended to allow Agent Warr to arrive and deal with Defendant regarding a suspected parole violation.  Examination of the detention after the AP&P Agent's direction to continue the hold involves the issue of reasonable suspicion from the point of view of Agent Warr, because, after he was contacted, the officers at the scene acted at his direction.  The reasonable suspicion required for the AP&P Agent to detain Defendant was that he was violating the terms of his parole.

> To determine whether reasonable suspicion for suspecting a parole violation exists, we consider the quantity and reliability of the information possessed by law enforcement and consider this information in light of the totality of the circumstances.[9]

Under *Griffin v. Wisconsin*,[10] the "special need" of states to supervise parolees permits "a degree of impingement upon privacy that would not be constitutional if applied to the public at large."[11]  The Supreme Court case law on parolee searches rests on the "parolee's diminished expectation of privacy stemming from his own parole agreement and the state regulations applicable to his case."[12]  The Tenth Circuit interprets the *Griffin* line of cases as extending to law enforcement officers who are not parole officers only if they

---

[9]*United States v. Freeman*, 479 F.3d 743, 749 (2007) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

[10]483 U.S. 868 (1987).

[11]*Id*. at 875.

[12]*Freeman*, 479 F.3d at 748.

8

"are acting under the direction of the parole officer."[13]  The Ogden Officer was searching Defendant's vehicle under the direction of Agent Warr when he discovered the gun and, therefore, the *Griffin* line of case applies to his search.

Agent Warr had the following information when he requested Defendant be held an additional five to ten minutes: Defendant had just been detained at the scene of a drug arrest as part of the investigation and the terms of Defendant's parole prohibited him from associating with any person involved in criminal activity.  The Court finds that when Agent Warr asked the Ogden Officer to detain Defendant, Agent Warr had a reasonable suspicion that Defendant was associating with people involved in criminal activity and, therefore, a reasonable suspicion that Defendant was in violation of his parole.

When he arrived at the scene, Agent Warr spoke briefly with the Strike Force Officer and questioned Defendant.  Agent Warr learned from Defendant that Defendant was at the motel and was associating with persons involved in the drug deal.  Agent Warr's initial reasonable suspicion that Defendant was in violation of the terms of parol was reinforced by this information obtained from his interview with Defendant.  Because Agent Warr had a reasonable suspicion of a parol violation, the search of Defendant's vehicle was valid as in compliance with his parole agreement's search provision.

In conclusion, the Court finds and concludes as follows: Defendant's initial stop and detention was supported by reasonable suspicion that Defendant was involved in or was about to commit a crime.  The prolonging of that detention for approximately ten minutes

---

[13]*Id.*

was justified by AP&P Agent Warr's reasonable suspicion that Defendant was in violation of the terms of his parole agreement.  The search of Defendant's vehicle was justified by Agent Warr's reasonable suspicion that Defendant was in violation of the terms of his parole agreement and that agreement's search provision.  Therefore, there is no Fourth Amendment violation and it is

ORDERED that Defendant's Motion to Suppress (Docket No. 11) is DENIED.  It is further

ORDERED that the time from the filing of the Motion to Suppress through the date of this Order is excluded from the computation of the Speedy Trial Act time pursuant to 18 U.S.C. § 3161(h)(1)(F) and (J).

DATED  May 9, 2007.

BY THE COURT:

_____
TED STEWART
United States District Judge